■ EUGENIA DALY, an Infant, by Her Parent and Father, MICHAEL DALY, et al., Respondents, v. HOWARD V. CASEY et al., Appellants.— Judgment, Supreme Court, New York County, entered December 29, 1972, as to defendant-appellant Tidewater reversed on the law, and complaint dismissed, without costs, and as to defendant-appellant Casey reversed, on the law, the facts, and in the interest of justice, the action against defendant Casey severed, and remanded for a new trial, without costs. The then eight-year-old plaintiff-respondent was struck by Casey's car as she came out from the sidewalk to cross a one-way street; her version, corroborated by seven witnesses, one a brother-in-law and the others neighbors and playmates, was that she proceeded around the front of a double-parked Tidewater Oil truck, which obscured her vision, into the street. There was no other theory advanced to connect the truck's presence, assuming it was there, with the happening of the accident. Both Tidewater and Casey denied the truck's presence, as did Maloney, the only police-blotter witness. The child was never seen by Casey until her emergence into the street itself and thus his vision would not have been obstructed any more than by an auto parked directly at the curb. Nor would such a truck have interfered with the child's ability to care for herself for she would have been protected from danger until emergence into the street, and would, in any event, have been expected in the exercise of ordinary care — even for an eight year old — to have stopped and looked before proceeding into the street proper. No one said that the truck was struck or otherwise involved in the actual blow to the child. The sidewalk was not obstructed, and the child's crossing was at midblock. Thus this case is distinguishable from *Mullen* v. *Fayette* (274 App. Div. 527, affd. 300 N. Y. 501) and *Petru* v. *Hertz Corp.* (36 A D 2d 704). We hold that the truck, if there, did not contribute to the accident to the child. If we did not dismiss on the law as to Tidewater, we would remand for retrial as against the overwhelming weight of the evidence. Casey's car was not moved from the scene before the police arrived; the first officer to arrive saw it and the skid marks leading to it, and promptly set his radio car athwart the approach to protect the scene. The investigating detective found it so on arrival, and made a field diagram with careful measurements, later transcribed onto a more formal diagram. Not all measurements were copied from one to the other, but those that were are identical with the field diagram. There was no evidence to contradict these measurements except the statement of the brother-in-law that Casey's tracks were in midstreet. The measurements indicate clearly that the distances from the curb of the curbside wheels of the Casey car were: front, 15 feet; rear, 13 feet. Assuming even a compact car to have been parked at the curb and accepting the truck's width as eight feet, and making no allowance for space between the parked vehicle and the curb, and between the truck and the parked vehicle, the closest free space in the street could not have been less than 14 feet out from the curb. Assuming all these factors, some of which actually defy assumption,

Casey's car would have, after slightly veering to the left to avoid the child, stopped with its right rear wheel in the space occupied by the truck. The clear physical evidence, negated only by the brother-in-law's unmeasured evidence, permits only of the inference that the truck was not there, and the weight of that physical evidence is overwhelming. Respecting the time-honored axiom that a jury's judgment as to the facts is all but sacrosanct, the evidence of plaintiff and the nonblotter witnesses is more than countervailed by the physical principle that two bodies cannot occupy the same space simultaneously. As to Casey, the only evidence of failure to have control of his vehicle lies in the fact that his car did strike the child, and this might have been enough of a foundation for the jury's verdict were it not for the peculiar circumstances of this case. So much attention was paid during this trial to the question of presence or absence of the oil truck that the issue as to Casey became beclouded and attention was diverted from Casey to the extent that the interest of justice requires a new trial on the clear issue of his negligence, uncomplicated by the issue as to the oil truck. It is directed accordingly. A brief addendum is necessitated by reason of observations made in the dissent. An appraisal is made of the evidence given by Tidewater's employees as to whether its truck could have been at the scene. The observations made seem to overlook entirely the fact that Tidewater had no burden to prove its truck was not there; it was up to plaintiff to prove it was, and plaintiff's proof is refuted by the physical evidence. As to the police evidence, while it is true that the officer "was simply another witness" and not "sacrosanct," there is nothing in the record to render that evidence suspect, particularly so as to the diagram made of measurements at the scene. Concur — Markewich, J. P., Steuer and Lane, JJ.; Murphy and Capozzoli, JJ., dissent in the following memorandum by Capozzoli, J.: I dissent. I see no reason to disturb the determination of the jury in this simple negligence action. The accident occurred in the afternoon of a clear day. The infant plaintiff, eight years old at the time of the accident, was struck by the vehicle owned and operated by the defendant, Casey. According to the version of the infant, a truck belonging to defendant, Tidewater, was illegally and improperly double parked, blocking the infant's view of the roadway. Her own words are found in the record: " Q. And then what? A. As I was coming out of the house, I saw a double-parked truck, so I just glanced at it, and I walked up to the driveway and I looked on the bridge to see if any cars were coming, and cars were on the bridge, but they were nowhere close to me, so I looked both ways and then I began to cross. Q. And what happened? A. Well, the double-parked truck blocked my view, and I got a few steps out past the truck, and then a car hit me." The majority writes: "We hold that the truck, if there, did not contribute to the accident to the child ". Surely, whether the truck was there, and eight witnesses testified that it was there, and whether it contributed to the happening of the accident, were issues decided by the jury, in favor of the infant, and I cannot understand how the action of the majority, in setting aside the jury's verdict, can be justified. In an effort to prove that no Tidewater truck was double parked at the scene of the accident, the defendant, Tidewater, called the witness, Frank Boysen, who identified himself as the terminal superintendent of Tidewater, who directed and supervised the drivers of the trucks, foremen, yardmen and others. Amongst other things, he testified that the terminal was in the general vicinity of the place where the accident occurred and that the trucks were often in the neighborhood and could be seen by lots of people. He also testified that there were 25 drivers who operated the trucks. Although none of the drivers was called

to cast any light on whether any truck was in the vicinity of the accident, the defendant, Tidewater, did attempt to show that none of Tidewater's trucks stopped at the accident site when it occurred. Mr. Boysen, on direct examination, testified as follows: "Q. Have you got some kind of contraption which monitors the activity of each of your trucks? A. Yes, we have. Q. Is it some kind of mechanical contrivance which tells you whether a truck has stopped for any period of time? A. Yes, it does. * * * A. It is called a tachometer. * * * Q. Is it possible with such a mechanical thing for you to find out whether a driver has made one or more stops during the course of a run? A. Oh, yes. Q. And have you done that? A. Oh, yes. Q. Now, I want you to tell us, please, after questioning all of these drivers, did you make an examination of the tapes of the tachometers on everyone of those trucks? A. I examined every tachometer chart of these trucks for that day. * * * Q. Did you find any chart which indicated that just before arriving at the terminal, or just upon leaving the terminal, there had been a stop-over where the truck had not been used during the run, before it reached its termination at either end? A. No, sir. Q. By 'No, sir,' you mean what? A. I saw no delay and no stopping shortly after leaving the terminal or shortly before returning to the terminal." His direct testimony continued: "Q. Now, what was the practice in your company at that time with respect to how long charts were maintained? A. Our practice in the company was to discard the charts after six months on file. Q. Were you able to get those charts? A. I wasn't able to get them. Q. Do you say to this jury as you sit there under oath that you personally examined those charts? A. I personally examined those charts. Q. And found no delay, such as has been described? A. That is correct." Later, on cross-examination of the same witness, there is the following: "Q. Now, when you examined those tachometers, you examined them because they were important evidence; is that right? A. To substantiate that our trucks were — whether or not they were in the neighborhood. Q. So they were important evidence? A. They were. * * * Q. So if they [tachometers] bore out what you said, they were important evidence, if they did? A. Yes. * * * Q. Did you make a single effort of carefulness in any regard to keep that valuable evidence for this trial? * * * A. No. Q. And then the day came when the evidence was destroyed; is that right? A. Yes, sir." It must be remembered that the contention of Tidewater, throughout the trial, was that the truck, placed at the scene of the accident, was purely a figment of someone's imagination and that it was never there. As demonstrated above, the superintendent of Tidewater knew about the accident and the theory of plaintiff's case, when the papers were served upon his company, and it was for that reason that he checked with the drivers as to their movements on the day of the accident. Further, he located the tachometer tapes, examined them and he concluded that no truck had stopped at the site of the accident when it occurred. In view of the sharp issues raised between the witnesses for the plaintiff and the contention of the defendant, Tidewater, the jury could very well have been adversely affected against Tidewater, not only because of its failure to safeguard this obviously important evidence, but, in fact, because it actually destroyed it, thus putting it out of the reach of the jury forever. If the tachometer tapes had been destroyed before Tidewater was advised of the law suit, their destruction could be understood, but, to destroy them afterward, is difficult to understand. As to the observation of the majority that the defendant, Casey, and the witness, Maloney, both denied the presence of the truck, it is important to note that, at the trial, the defendant, Casey, testified that, after the accident: "I don't

know what I did. I was confused. The shock was so terrific." In view of that statement how reliable can his testimony be with reference to any observations made by him as to double-parked trucks? He had earlier testified that he didn't notice any. The witness, Maloney, at one point testified as follows: " Q. Is this a fact, that you can't really remember whether there was a truck double parked or not? * * * A. Yes." Again, the same witness testified: " Q. And during that ten-minute period you did not see any double-parked gas tanks at that point—gas trucks, did you? A. I don't remember seeing any. Q. Well, your best memory as it serves you now is that you recall none; isn't that true? A. That's true." The police officer, upon whose testimony the majority places great reliance, was simply another witness in the case, whose testimony was subject to examination by the jury as to its reliability and accuracy. There were questions as to just where the skid marks started, which way they ran, the accuracy of the measurements and his overall veracity. All of these things raised questions for the jury to resolve. There is nothing sacrosanct about the officer's testimony which put it beyond the power of the jury to examine and reject it, in light of the totality of all of the evidence in the case, if it chose to do so. As to the defendant, Casey, surely it was for the jury to decide whether, in driving through this street, on which families with children resided, he kept his automobile under proper control, whether he was driving at a reasonable speed, whether he gave any warning of his approach as he drove along a street with parked cars and whether his view was obstructed by the gasoline truck, which the jury believed was double parked. These are all fact questions. On this record I can see no reason for this court interfering with the unanimous verdict of the jury and, therefore, would affirm.